# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 251 - 1 through 6 | **DATE** | 1/21/2004 |
| **CASE TITLE** | USA vs. Piotr Misolek | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] In court hearing held. For the reasons stated in the attached memorandum opinion and order, defendant Piotr Misolek's motion to quash arrest warrant [28-1] is granted and defendant Piotr Misolek's motion to suppress evidence [28-2] is denied. Enter Memorandum Opinion and Order. Status hearing set for 1/27/04 at 10:00 a.m. as to defendant Piotr Krasinski only. Time is ordered excluded to 2/17/04 as to all defendants pursuant to 18:3161(h)(8)(A)(B). (X-T).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | JAN 23 2004 | |
| | Notified counsel by telephone. | | date docketed | 76 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | MF | courtroom deputy's initials | date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>  )<br>Plaintiff,  )<br>  )<br>v.  )<br>  )<br>PIOTR MISIOLEK,  )<br>  )<br>Defendant.  ) | No. 03 CR 0251<br><br>Judge John W. Darrah |



## MEMORANDUM OPINION AND ORDER

Defendant, Piotr Misiolek, was charged in a three-count superseding indictment of knowingly and intentionally distributing a controlled substance; transporting vehicles known to have been stolen; and receiving, possessing, concealing, storing, selling, and disposing of motor vehicles which had crossed a state boundary after being stolen.

Subsequently, Defendant filed a Motion to Quash Arrest and Suppress Evidence; and the parties filed briefs in support of their respective arguments. An evidentiary hearing on the motions was held, which consisted of the testimony of two of the arresting agents. Following the hearing, the parties submitted argument in post-hearing memoranda and responses.

The facts underlying the arrest and the search of the Defendant's residence at 5768 Oleander on the evening of March 5, 2003, are generally not in dispute and are summarized below based on the parties' briefs and the evidentiary hearing.

### Facts Known to Government Agents before 5 p.m. on March 5, 2003

Agents, working with several confidential sources, were investigating individuals, including the Defendant, believed to be involved in the distribution of controlled substances and stolen motor vehicles.

On February 19, 2003, agents conducted "trash pulls" at the Defendant's residence of 5768 Oleander in Chicago. Items recovered in the trash pull included twelve pages of what appeared to be a drug ledger. FBI Agent James Muha avers that the ledger contained "details of pill and money amounts and customer names." The factual basis for this conclusion is not provided in Muha's affidavit. Other items recovered included copies of ten checks all drawn on one checking account in amounts payable ranging from $1,000 to $9,000 and an Illinois Department of Revenue vehicle tax record for a 2002 Cadillac Escalade.

On March 4, 2003, Marzena Gabiga gave a proffer interview to the U.S. Attorney for the Northern District of Illinois regarding her knowledge of drug trafficking and stolen vehicles in the Chicago area. Several agents were also present at the proffer interview. Gabiga stated, in pertinent part, that she met the Defendant two or three years ago and that she learned that the Defendant made money by selling ecstasy that he obtained in Canada. As recently as December 2002, Gabiga received ecstasy pills from the Defendant at his Oleander residence. Gabiga also became involved in stolen cars with the Defendant in December 2002. The Defendant told Gabiga that he had received approximately 20,000 to 25,000 pills from his Canadian source at one time and that she had delivered packages from the Defendant to people at a Hooters Restaurant near Cumberland and Higgins in Chicago, Illinois.

Also on March 4, 2003, the Defendant and Andrzej Ogonowski, a co-defendant, left

Fort Lauderdale, Florida. The Defendant and Ogonowski drove continuously to Chicago, Illinois, arriving in Chicago on March 5, 2003. While driving to Chicago, Ogonowski and Defendant gave directions to a Hooters restaurant on Higgins Road to a cooperating individual via a cell phone.

On March 5, 2003, federal agents believed that the Defendant and Ogonowski would be involved in the sale of a large quantity of ecstasy. The agents had been working with the assistance of a cooperating individual, who was attempting to make a purchase of 10,000 pills. The Government did not obtain a search warrant based on these facts.

### Facts Known to Government Agents After 5 p.m. on March 5, 2003

At approximately 5:00 p.m., agents took three surveillance posts: (1) near the Defendant's main residence of 5768 Oleander, (2) at Ogonowski's main residence at 4221 Osceola, and (3) at a location near Cumberland and Higgins Road. In addition to the Defendant's main residence on Oleander, the Defendant owned a house he was rehabbing at 5832 Oriole. In addition to Ogonowski's main residence on Osceola, he owned a house he was rehabbing at 5840 Oriole. The two houses on Oriole were within a block of Defendant's Oleander residence.

At approximately 5:50 p.m., a Jeep Cherokee with a Canadian license plate pulled into a parking lot at the Cumberland/Higgins location. A white male was alone in the driver's seat of the Jeep. The Jeep stayed at that location until approximately 6:18 p.m. The driver did not leave the vehicle and appeared to be talking on a cell phone for approximately half of the time.

After leaving the parking lot, the Jeep proceeded east on Higgins Road in the general direction of the Defendant's residence on Oriole Avenue. A few moments later, the Jeep was observed driving past the Defendant's Oriole house, making a u-turn, and parking in front of the Defendant's Oriole house. Agents then observed the Defendant exit the Jeep, walk towards his

3

house on Oriole, and appear to enter the front door. The Defendant was then seen exiting the front area carrying a construction-type trash bag that he threw into a nearby dumpster. The Defendant and Ogonowski deny that the Defendant was in the Jeep.

Agents then observed a white Lexus drive by the Defendant's Oriole house and circle the block a few times. Two white males were inside the white Lexus. The agents identified the driver of the Lexus as Ogonowski. Ogonowski parked the Lexus behind the Jeep that the Defendant had been driving. The Defendant was standing in the street when the Lexus parked.

Ogonowski exited the Lexus and met with the Defendant behind the Jeep. The passenger of the Lexus exited the Lexus and entered the driver's side of the Jeep. The Defendant ran towards the front door of his Oriole house with Ogonowski following him. The Lexus passenger then exited the Jeep, walked back to the Lexus, leaned into the passenger side of the Lexus, shut the door and went to the front door area of the Defendant's Oriole house. The three individuals were out of the agents' view for about three minutes and then appeared to come from the Defendant's Oriole house. Ogonowski entered the driver's side of the Lexus, and the Defendant got into the passenger side of the Lexus. The Lexus passenger entered the Jeep and drove south. The Lexus pulled away after the Jeep was out of sight and headed to the Defendant's residence on Oleander, about a half block away.

At the Defendant's Oleander residence, Ogonowski stopped the Lexus and popped the trunk. The Defendant exited the Lexus, stood next to the car, and looked up and down the street for a few moments. The Defendant then reached into the trunk of the Lexus and pulled out a duffel bag. The Defendant went towards his Oleander residence. Before entering his residence, the Defendant turned and looked around carefully. Ogonowski stayed a few moments and then pulled away from the residence when the Defendant was inside. At this time, the Jeep circled the blocks around the

4

Defendant's two homes.

The agents next observed Ogonowski traveling west on Higgins Road. After driving past the parking lot where the Jeep was first spotted, Ogonowski parked in a parking lot further down on Higgins Road, and he met with the cooperating individual for about three minutes. Ogonowski told the cooperating individual that he wanted him to follow Ogonowski to "the house" to do the deal. The cooperating individual refused and indicated that he wanted to do the deal "here". Ogonowski then drove out of the restaurant parking lot, traveling in the direction of the Defendant's residence on Oleander and the two homes on Oriole.

Ogonowski was next observed about 12 or 13 minutes later when he was seen driving westbound on Higgins Road when he entered the parking lot and parked the Lexus. Agents did not observe Ogonowski from the time he left and later returned to the parking lot.

In the parking lot, the cooperating individual walked up to Ogonowski's vehicle with empty hands and stopped at the driver's side window for a moment. The cooperating individual then walked around the car, opened the passenger door, and leaned into the vehicle. The cooperating individual took a package from the front passenger side area of Ogonowski's vehicle.

The cooperating individual then walked back towards his vehicle carrying a black plastic bag. He opened the trunk of his vehicle, placed the bag in the trunk, and closed the trunk. At this point, the agents arrested Ogonowski and retrieved the plastic bag from the trunk of the cooperating individual's vehicle.[1] The plastic bag contained approximately 9,000 pills of ecstacy.

---

[1] The exact status of the person who received the package of ecstasy is unclear. The Government refers to him as a "cooperating individual" in its brief. However, the affidavit attached to the Complaint against the Defendant recites that this person was a white male who fled after putting the package of ecstasy in the trunk and was never apprehended.

5

Immediately following Ogonowski's arrest, some of the agents returned to the Defendant's Oleander residence. While there were several agents posted at the various doors to the Oleander house, four agents went to the front door to advise the Defendant that he was to be arrested. The Defendant was at the window north of the front door of his residence when the agents first arrived. The Defendant started closing the blinds to the windows south of the front door. As is standard operating procedure, the agents had their guns drawn. The agents identified themselves as law enforcement officers and informed the Defendant that he was under arrest. The agents observed the Defendant look out the clear glass doors of the residence and then run to the back of the home. The Defendant did not respond to the agents.

While the agents repeatedly instructed the Defendant to open the door and submit to the arrest, the Defendant ran back and forth from the front of the home to the back of the home a number of times. The agents continued to advise the Defendant that he was under arrest. The Defendant stated something about a warrant and asked, "What are you going to do, shoot me?" The Defendant continued to run back and forth from the front and back of his home. Within 2 or 3 minutes of their arrival, the agents made a forced entry of the Defendant's residence.

Upon entering the Defendant's residence, Agent James Muha told the Defendant to get down on the ground; and he placed the Defendant in handcuffs. The agents returned their guns to their holsters upon restraining the Defendant.

Other agents that entered the home, including Agent Thomas Mazurski, conducted what was described as a "protective sweep" of the residence. Agent Mazurski went into the basement as part

of his protective sweep. Upon returning from the basement, Agent Mazurski escorted the Defendant from the living room into the kitchen. During this time, Agent Mazurski un-handcuffed the Defendant.

In the kitchen, Agent Mazurski advised the Defendant that he was under arrest, read aloud each line of the form, and had the Defendant read each line of the *Miranda* form aloud. After he read each line of the form, the Defendant initialed each line. He then signed the bottom of the form indicating that he understood each line. Agents Mazurski and Muha also signed the form. The form indicates that it was executed at 7:25 p.m., approximately 17 minutes after the agents entered the residence.

While in the kitchen, Agents Mazurski and Muha interviewed the Defendant. The Defendant was asked about certain individuals; at which time, he produced a telephone number for an individual named Angelo. The Defendant stated that he could order pills from Angelo at that time but that it would take approximately two days to get the pills.

Another agent returned from the basement and advised the agents that there was a section of the basement floor that appeared to have been redone. Agent Mazurski asked the Defendant if they could search the area because the agents had received information that the Defendant had installed a safe in his basement. The Defendant took the agents into the basement and told the agents that he could break up the floor if they wanted. At this time, Agent Mazurski read a consent form to the Defendant. The Defendant then read the form and asked that the agents not destroy any of the house. Agent Mazurski told the Defendant that he would add a statement indicating such on the form. After adding the requested language, the Defendant and Agents Mazurski and Muha signed the consent form. Before the Defendant signed the consent form, Agent Muha told the Defendant that if he did

not sign the consent, eventually the agents would come back later with a warrant and conduct the search.

After the consent form was signed, Agent Mazurski asked the Defendant if there were any narcotics in the home. The Defendant informed the agents that there was a jar of pills in an upstairs bedroom. The Defendant showed the agents where the jar of pills was located upstairs. The Defendant stated that the jar of pills represented all the different types of pills he had received over a period of time.

During the Defendant's conversations with the agents, the Defendant spoke English and did not appear to have difficulty speaking, reading, or understanding English. The Defendant spoke in a conversational tone during the conversations. The Defendant was not re-handcuffed until he was leaving the residence to be placed in a vehicle. The agents never redrew their weapons after the Defendant was restrained.

## Motion to Quash Arrest

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). However, such searches and seizures are permitted when probable cause and exigent circumstances exist. *See Kirk v. Louisiana*, 536 U.S. 635, 637 (2002).

Probable cause exists "when the facts within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." *United States v. Sawyer*, 224 F.3d 675, 678-79 (7th Cir. 2000). Probable cause does not require an actual showing of criminal activity but merely

a substantial chance of criminal activity. *See United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003 (*Schaafsma*). When determining whether probable cause exists in a given situation, the court examines the totality of the circumstances in a commonsense manner. *See Schaafsma*, 318 F.3d at 722.

The Government argues facts known before the Defendant's arrest on March 5 support a finding of probable cause. At the time of the arrest, the agents knew that the Defendant had made prior drug dealings and that the Defendant and Ogonowski had prior financial and other criminal relationships. The agents knew that the Defendant had previously possessed drugs for distribution in a prior residence and that he had possessed drug distribution records in the residence in which he was arrested. However, this information, if it can be said to support the conclusion asserted by the Government, involved conduct by the Defendant which had occurred at least several weeks earlier when it was discovered during an inspection of trash at the Defendant's residences. The Government also argues that the day before the Defendant's arrest, Gabiga had informed the agents that she knew that the Defendant dealt with large quantities of drugs and stolen vehicles. However, the last time she could remember such alleged transactions was in December 2002, three months prior to the arrest. Also, while the Government submitted evidence that the agents knew that the Defendant gave directions by cell phone to a cooperating individual earlier on the day of Defendant's arrest to the restaurant location that was the site of the drug buy, there is no evidence that during this telephone conversation any drugs or illegal matters were discussed.

Furthermore, the agents never saw the Defendant, Ogonowski, or the third individual enter any of Defendant's residences and retrieve any type of bag or parcel. While the agents observed the Defendant retrieve one duffel bag from the Lexus, the presence of this bag is reasonably consistent

9

with the fact that the Defendant had just returned from out of state travel, which was also known by the agents. Nothing was presented by the Government which would reasonably connect the Defendant with the presence of the drugs in the Lexus occupied only by Ogonowski later during the delivery to the cooperating individual.

Most significantly, the agents did not follow nor in anyway observe Ogonowski during the 12 or 13 minutes after he left the restaurant parking lot and before he returned to the scene of the drug delivery with the drugs. There is no evidence that Ogonowski went to any of the Defendant's two residences to retrieve these drugs. Lastly, while Ogonowski wanted to conduct the drug transaction at "the house," there was no specific indication as to which of the houses on Oriole/Oleander he was referring. It is at least equally reasonable to conclude that Ogonowski's reference to "the house" was to his own home on Oriole, which is within a block of where the Defendant was arrested. Importantly, the agents had Defendant's Oleander residence under surveillance at this time, yet, presented no evidence that Ogonowski returned to the Defendant's Oleander residence during this 13-minute period after first meeting with the cooperating individual and before returning to the restaurant parking lot to deliver the drugs.

Based on these facts, probable cause cannot be found to arrest Defendant at his home on March 5, 2003.

While the Government, in its briefs, seems to concede that the legality of the entry into the Defendant's Oleander residence requires a finding of probable cause for his arrest, it also argues alternatively that exigent circumstances support the entry.

Assuming arguendo, that probable cause did exist, exigent circumstances did not exist to compel entering the Defendant's home without a warrant.

10

Exigent circumstances exist when there is a compelling need for official action and there is no time to secure a warrant. Such circumstances include when the police have an objective and reasonable belief that evidence is about to be destroyed or that there is a risk of danger to the police or other persons inside or outside the home. *See Minnesota v. Olson*, 495 U.S. 91, 100 (1990).

The government bears the burden of demonstrating that its agents had an objectively reasonable belief that exigent circumstances existed at the time of the warrantless entry in a defendant's home. *See United States v. Marshall*, 157 F.3d 477, 482 (1998) (*Marshall*). The exigent circumstances must exist at the time of the warrantless entry; it cannot be based on evidence discovered during the search. *See United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003). The court analyzes the situation from the perspective of the officers at the scene. Accordingly, the court asks, "not what the police *could* have done but rather whether they had, at the time, a reasonable belief that there was a compelling need to act and no time to procure a search warrant." *Marshall*, 157 F.3d at 482.

The facts, as more thoroughly discussed above, show that the agents did not have an objectively reasonable basis, from the totality of the circumstances, to believe that exigent circumstances existed that required their warrantless entry into the Defendant's residence. The agents concluded that the Defendant had a history of drug trafficking and had previously had drugs inside a different residence. However, the most recent date of which the agents had reason to believe drugs had been in the home was December 2002. While the agents believed that the Defendant took a duffel bag into his residence on March 5, 2003, it is undisputed they knew he was returning from an out-of-town trip. In addition, while the Defendant provided directions to the location where Ogonowski would later deliver the drugs, no discussion of pills, drugs, drug delivery or any other

11

illegal activity was discussed during that conversation. Most significantly, even though Ogonowski was arrested with approximately 9,000 ecstacy pills, the agents did not know where Ogonowski went to retrieve the pills; and the Government presented no evidence that he returned to the Defendant's residence (which was under surveillance) to do so or which otherwise connected the Defendant to the pills.

The Defendant's refusal to let the agents into his home without a warrant also fails to support the Government's assertion that the Defendant may have been preparing to destroy evidence without some showing that such evidence was known to be in the home. These facts fail to demonstrate that the agents had a reasonable belief that there was a compelling need to act and no time to procure a search warrant – a reasonable belief that evidence was about to be destroyed.

Furthermore, the Defendant's one statement, "What are you going to do, shoot me?" fails to demonstrate a reasonable belief that there was a risk of danger to the police or other persons. Other than the stray remark, there was no evidence that the Defendant was known to possess any type of weapon or that he previously presented any type of physical danger to others.

Accordingly, the Defendant's Motion to Quash Arrest is granted.

## Motion to Suppress Evidence

The Defendant moves to suppress evidence that was seized subsequent to his arrest based upon the illegality of his arrest.

Evidence that is obtained following an illegal arrest must be suppressed unless there is sufficient evidence demonstrating a purge of the unlawful arrest. *See Kaupp v. Texas*, 538 U.S. 626, ___ (2003) (*Kaupp*). Relevant considerations include the observance of *Miranda* warnings, the presence of intervening circumstances, the temporal proximity of the arrest and the obtained

evidence, and the purpose or flagrancy of the official misconduct. The government bears the burden of persuasion. *See Kaupp*, 538 U.S. at ___.

In the instant case, the Government concedes that given the timing of the warrantless entry, the timing of the *Miranda* waiver, and the executed consent to search, the post-arrest statements made by the Defendant and the pills recovered during the consent search must be suppressed if the warrantless arrest is found to be unlawful. Having found that the warrantless arrest was illegal, the statements made by the Defendant and the pills recovered during the consent search are suppressed.

After the initial warrantless entry and search, the Government obtained a search warrant for the Oleander premises. The Government contends that if the initial search was unlawful, the documents from the Defendant's residence that were secured and not searched prior to the issuance of the subsequent warrant should not be suppressed under the independent source doctrine. The Government does not contend that the independent source doctrine would apply to the ecstacy pills seized from the Defendant's residence on March 5, 2003.

The independent source doctrine allows the introduction of evidence that is discovered initially during an unlawful search if the evidence is discovered later through a source that is untainted by the initial illegality. *See United States v. May*, 214 F.3d 900, 906 (7th Cir. 2000) (*May*). For example, if the police discover items x and y during an illegal search and later discover item z during an independent legal search, item z is admissible because it was derived from an independent source. *See May*, 214 F.3d at 906. Furthermore, if during the untainted legal search, the police discover not only item z but also rediscover items x and y, x and y as well as item z are admissible. *See May*, 214 F.3d at 906.

A two-part test determines whether the evidence was obtained by independent lawful means:

13

(1) whether the officer's decision to seek the warrant resulted from what he had seen or seized during the unlawful search and (2) whether the illegally obtained evidence caused the magistrate to issue the search warrant. If the answer to both these inquiries is no, the evidence need not be suppressed despite the fact that it was initially unlawfully obtained. *See May*, 214 F.3d at 906. Here, there is no evidence that the agent's decision to seek the warrant resulted from what had been seen or seized during the unlawful search.

As to the second inquiry, the court generally determines whether probable cause to search is established without the illegally obtained evidence. *See United States v. Markling*, 7 F.3d 1309, 1316 (7th Cir. 1993). There is no showing that the subsequent warrant was based on facts obtained from the illegal search. Accordingly, those items that were rediscovered in the subsequent legal search are not suppressed pursuant to the independent source doctrine.

Lastly, the Defendant contends that the *McLaughlin* rule was violated. As explained in *Gerstein v. Pugh*, 420 U.S. 103, 124-25 (1975), the Fourth Amendment requires that a "fair and reliable" determination of probable cause be made by a judicial officer "either before or promptly after arrest." Judicial determinations of probable cause that are made within 48 hours of arrest are presumptively reasonable, and such presumption can only be overcome if the defendant can prove that his probable cause hearing was delayed unreasonably. *See Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (*McLaughlin*).

Here, the Defendant was arrested in the late evening of March 5, 2003. The complaint for this arrest was docketed as case number 03 CR 238. On March 7, 2003, initial appearance proceedings were held and a preliminary examination and detention hearing was scheduled for March 10, 2003. On March 10, 2003, the magistrate judge determined that probable cause had not

been established and dismissed the complaint against the Defendant. That same day, the Government added details to its initial affidavit in support of the complaint. These details were omitted from the initial affidavit in an attempt to prevent the premature disclosure of the existence of a cooperating individual in the investigation. Based upon the supplemented affidavit, a different magistrate judge issued a complaint upon a probable cause affidavit. This complaint was docketed as case number 03 CR 251. The Defendant had his initial appearance on the second complaint on March 11, 2003; at which time, a preliminary examination was scheduled for March 14, 2003. On March 14, 2003, a finding of probable cause was entered against the Defendant.

The above facts show that the Defendant had an initial appearance within 48 hours of his initial arrest and the second complaint filed against him. However, the probable cause hearing did not occur until 5 days after his arrest and 4 days after the second complaint. This delay is a violation of the standards set forth in *McLaughlin,* and the Government does not provide an excuse for such delay. *See United States v. Fullerton*, 187 F.3d 587, 590-92 (7th Cir. 1999) (*Fullerton*). However, while the delay in bringing the Defendant before a magistrate to determine probable cause violates the rule articulated in *McLaughlin*, the suppression of evidence is not the proper remedy for this violation as none of the evidence that the Defendant seeks to suppress was obtained pursuant to the *McLaughlin* violation. *See United States v. Fullerton*, 187 F.3d 587, 590-92 (7th Cir. 1999) (finding suppression of evidence was not the proper remedy for the *McLaughlin* rule violation).

Based on the above, the Defendant's Motion to Suppress Evidence is granted in part and denied in part.

For the reasons stated above, Defendant's Motion to Quash Arrest is granted. Defendant's Motion to Suppress Evidence is granted in part and denied in part.

Dated: January 22, 2004

JOHN W. DARRAH
United States District Judge